STATE of Oklahoma, ex rel., OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

Coy H. McKENZIE, Respondent.

OBAD No. 890.
SCBD No. 3557.

Supreme Court of Oklahoma.

Dec. 12, 1989.

As Amended on Denial of
Rehearing Feb. 5, 1990.

Dan Murdock, Gen. Counsel, OBA, Okla-
homa City, for complainant.

Gary Rife, Norman, for respondent.

ORDER

Upon consideration of the briefs, and a *de novo* consideration of the transcript of the proceedings conducted before a panel of the Professional Responsibility Tribunal, in the above styled and captioned cause, THE COURT FINDS:

(1) The findings and conclusions of law made by the Trial Panel are established by clear and convincing proof; the allegations of the respondent, Coy H. McKenzie, are not. By his own admission, the respondent was aware that his client had great personal trust in him, both as a friend and as her attorney. He used his considerable personal and professional influence over her to induce her to invest substantial sums in a risky race track venture in which he had a substantial personal business interest, and in which he was heavily indebted, and on the edge of financial collapse. This is evidenced by the use of the loans to pay respondent's personal debts including debts incurred by his own ranch and stables as well as the race track debts. The respondent improperly served as attorney for his client, both in regard to her investments, as well as her attorney in the foreclosure action, where the exercise of his professional judgment was clouded by his own financial, business, property and personal interests. Therefore, the trial panel's findings and conclusions of law are hereby approved, incorporated herein, and attached hereto as Appendix A.

(2) The complainant's motion to strike is hereby denied.

(3) The respondent engaged in conduct contrary to prescribed standards of conduct in violation of 5 O.S.1981 Ch. 1, App. 1–A, Rule 1.3; engaged in conduct involving dishonesty, fraud, or deceit, 5 O.S.1981 Ch. 1, App. 3, DR 1–102(A)(4); accepted employment when his professional judgment would be affected by his own personal interests and also accepted employment when he could be called as a witness in the pending litigation, 5 O.S. 1981 Ch. 1, App. 3, DR 5–101; entered in a business transaction with a client when they have differing interests and the re-

spondent was expected to exercise professional judgment for the client, 5 O.S. 1981 Ch. 1, App. 3, DR 5–104(A); accepted employment when the exercise of his independent professional judgment would have been adversely affected by the employment and continued in multiple employment when the exercise of his independent professional judgment on behalf of one client would be adversely affected by his representation of the other client, 5 O.S.1981 Ch. 1, App. 3, DR 5–105(A)(B); prejudiced and damaged his client during the course of the professional relationship, 5 O.S.1981 Ch. 1, App. 3, DR 7–101.

(4) The respondent should be disbarred.

(5) The respondent should pay the costs of this proceeding in the amount of $2,724.05.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by this Court that the complainant's motion to strike is denied; that the respondent, Coy H. McKenzie be, and he is hereby disbarred and his name stricken from the roll of attorneys. The respondent is ordered to pay costs assessed in this proceeding in the amount of $2,724.05.

DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE.

OPALA, V.C.J., and SIMMS, DOOLIN, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

HARGRAVE, C.J., and LAVENDER, J., concur in result.

### APPENDIX A

In the Supreme Court of the State of Oklahoma

STATE OF OKLAHOMA, ex rel., Oklahoma Bar Association,

Complainant,

-vs-

COY H. MCKENZIE,

Respondent.

### REPORT OF THE TRIAL PANEL

Aug. 9, 1989.

The matter of the complaint against Respondent was heard by the Trial Panel on May 31st and June 1st, 1989, during which time testimony and documentary evidence were presented to the Trial Panel. Complainant, STATE OF OKLAHOMA, ex rel Oklahoma Bar Association, was represented by Mr. Dan Murdock, General Counsel for the Oklahoma Bar Association. The Respondent, COY H. MCKENZIE, was represented by Mr. Gary A. Rife and Mr. Tom Lucas.

These proceedings are commenced pursuant to the provisions of Rule 6 of the Rules Governing Disciplinary Proceedings, 5 O.S., Chapter 1, App. 1–A (1981).

The Respondent, who has been a lawyer since he was licensed to practice by the Oklahoma Supreme Court in 1962, is charged with violating the mandatory provisions of the Rules Governing Disciplinary Proceedings, Rule 1.3 (commission of acts contrary to prescribed standards of conduct) and of Rule 1.4(b) (failure to apply money entrusted to him for a specific purpose), and violations of:

DR 1–102 (A)(2) . . . . . . . . . . circumventing a disciplinary rule through actions of another;

(A)(4) . . . . . . . . . . engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(A)(5) . . . . . . . . . . engaging in conduct that is prejudicial to the administration of justice;

(A)(6) . . . . . . . . . . engaging in any other conduct that adversely reflects on his fitness to practice law;

DR 2–101 (A)(1) and (2) . . . making a false or misleading communication about the lawyer or the lawyer's services;

DR 5–101 (A) and (B) . . . . . accepting employment when the interest of the lawyer may impair his independent professional judgment;

DR 5–104 (A) . . . . . . . . . . . . limiting business relations with a client;

DR 5–105 (A) and (B) . . . . . accepting employment when the interest of another client may impair the independent professional judgment of the lawyer;

DR 6–101 (A)(3) . . . . . . . . . . failing to act competently by neglecting a legal matter entrusted to him;

```
DR 7-101 (A)(3)..........intentionally prejudicing or
                         damaging a client;
DR 7-102 (A)(3)..........failing to disclose;
         (A)(5)..........false statement of law or
                         facts;
         (A)(8)..........knowingly engaging in con-
                         duct contrary to discipli-
                         nary rule.
```

The allegations and evidence cover two different matters and circumstances.

## PART "A"—PROBATE MATTER

The first involves the question of whether the Respondent neglected to complete the probate of the Estate of Mary Clementine Brendle, Deceased, Case No. P–80–107, District Court of Cleveland County, Oklahoma.

The Respondent was hired in 1980 by Mary Luella Brady, now Humphreys (herein referred to as Luella Brady), daughter of the decedent, to probate the Decedent's Will. Mrs. Brendle died on June 9, 1980. The Petition for Probate of Will was filed on June 18, 1980, and proceeded through the usual course with the appointment of Luella Brady as Executrix on July 7, 1980, at which time Notice to Creditors was filed, and thereafter timely published. The Court file reflects no further action taken until other attorneys were retained for the approval of oil and gas leases, and for the filing of a General Inventory and Appraisement; all of which was done in 1986.

Respondent admitted that he did no work on the probate file after July, 1980, and took no action to complete the probate because his his attempt to prepare the Inventory, it became apparent that the filing of an accurate Inventory could have "disastrous tax consequences" to the Estate, particularly in regard to the probable failure of the decedent to declare income over a period of years, and the substantial taxes and penalties which would arise therefrom. Of the choices available, he testified that he recommended, and Mrs. Brady chose, that the best approach was to do nothing further (T–256–260, 398).

The Respondent's testimony was credible on this point, particularly in view of the fact, admitted by the parties, that decedent's husband, prior to his death in 1965, had been a long time leader of the Chicago underworld. Further, the family had a history of doing their personal and business transactions in cash, without record keeping.

There was no particular testimony from the Executrix (Mrs. Brady) on this point, other than she turned all legal matters over to the Respondent to handle because they were personal friends and she trusted him.

We also note that after Respondent was replaced as attorney for the Estate, the probate court file shows that the successor attorney, after filing a General Inventory in 1986, has taken no further action.

The Trial Panel finds that the evidence is insufficient to support the allegation that Respondent neglected the probate action, and said Trial Panel concludes as a matter of law that this allegation is without merit.

## PART "B"—STROUD RACE TRACK INVESTMENTS

Mrs. Brady asserts that Respondent misused his considerable personal and professional influence over her, as her attorney, to induce her to invest a substantial amount of her and her family's financial holdings in a risky race track venture in Stroud, Oklahoma, relying upon his expertise and professional judgment; further, that Respondent had multiple conflicts of interest as an owner of the race track, with both the race track and the Respondent heavily in debt and on the edge of financial collapse; further, that Respondent used fraud, misrepresentation, and professional misconduct in the inducement; further, that Respondent accepted employment as Mrs. Brady's attorney when the exercise of his professional judgment would be adversely affected by his own financial business, property and personal interests. (See Respondent's Exhibits 5, 6 and 7)

*Background:* Mrs. Brady, the primary complaining witness, was the only child of Murray Humphreys, a Chicago mobster, who, by her testimony, was the successor of Al Capone. Mrs. Brady was a high school graduate, attended several colleges

in the United States and abroad, and "accumulated almost enough credit hours to entitle her to a college degree (T–115). She was a licensed real estate broker in Oklahoma from 1961 to 1965, but never used it (T–117).

In 1965, after her father's death, Mrs. Brady had a severe disagreement with her mother, Mary Clementine Brendle. Her mother brought a legal action to have Mrs. Brady committed to Central State Hospital at Norman, Oklahoma. This was when Mrs. Brady first became acquainted with the Respondent, Coy H. McKenzie. She hired him as her attorney and he successfully defended her, and she was found to be competent and was not committed (T–41, 400). Thereafter, Mrs. Brady left Oklahoma and did not return until 1973. During that time, she was convicted in the State of Oregon for a felony offense of possession of drugs (T–53), and served three (3) years in prison and was then on probation for four (4) years. She now admits that she was manufacturing drugs for her then husband, who was an addict (T–125). After Mrs. Brady's release from prison in 1973, she returned to Oklahoma, where she lived at Brendle Corner, east of Norman, Oklahoma, on family properties.

In 1978, because of her high regard for the Respondent, Mrs. Brady referred her mother to Respondent for the drafting of Mrs. Brendle's Will, as well as a trust instrument (T–43), whereby thereafter, Mrs. Brady and the Respondent began seeing each other on a regular basis and were the best of friends (T–126).

Sometime before Mrs. Brendle's death in 1980, the Respondent approached Mrs. Brady and her mother about investing in the Stroud Race Track, known as Midway Downs (T–121, 123), but they were not interested at that time.

The events, which are the subject of Part "B" of this Report, occurred between 1980 (after Mrs. Brady's mother's death) and 1984, as discussed elsewhere in this Report.

In 1985, Mrs. Brady suffered a stroke, which resulted in physical and mental disabilities, including some memory loss (T–93, 200). Her cousin, Eddie Brendle, testified that Mrs. Brady had some history of mental instability since childhood, and that after her stroke, she suffered some continuing mental disability (T–352–356).

In 1987 Mrs. Brady released the Respondent from all civil liability as part of an over-all settlement among several principals and a bank creditor, arising from the race track venture. Mrs. Brady received $10,000.00 from Respondent's mal-practice insurance carrier, which sum was then remitted to the Bank as part of the consideration for Mrs. Brady's release from a deficiency judgment held by the Bank (Respondent's Exhibit 3, T–410–412).

## SUMMARY OF FACTS AND TESTIMONY

Most of the facts involving the Stroud race track are not in dispute.

In addition to practicing law, Respondent was heavily involved in the horse racing industry in the State of Oklahoma, particularly Midway Downs Race Track in Stroud (T–237). He formed a corporation in 1969 called Midway Downs Ltd., which purchased and operated the track facility (T–242). He was the President of this corporation from its inception until its eventual financial demise (T–381), which involved the time period which is the subject of this Bar complaint. During the early years, Respondent was the owner of a 15% interest in the race track, and increased his ownership to a majority interest at the time of the involvement of Mrs. Brady (T–239–242). In the 11 year operation of the race track, it never showed a profit or paid a dividend to the stockholders (T–272).

After her mother's death in 1980, Mrs. Brady talked to Respondent about her need to make investments to increase income for her and her son, George (T–48, 125). The family wealth was held at that time in differing portions among four (4) entities, i.e., Mrs. Brady, individually; her son, George Brady, individually; Mrs. Brady, as Executrix of the Estate of Mary Clementine Brendle, Deceased; and George Brady, Trustee of the Irrevocable Inter–Vivos Trust created by Mary Brendle. Previous-

ly, in 1978, Respondent prepared the Trust, in which certain real property was transferred by Mrs. Brendle to George Brady, Trustee, for the use and benefit of Mrs. Brady. Simultaneously, Respondent prepared the Will of Mrs. Brendle, wherein Mrs. Brendle bequested all jewelry and personal effects to Mrs. Brady. All the rest and residue of her estate was devised and bequested to the Trust for the benefit of Mrs. Brady.

In June, 1980, shortly after Mrs. Brady's mother's death, Respondent drafted and secured a General Power of Attorney (Complainant's Exhibit 6) from George Brady, in favor of Mrs. Brady. Respondent testified that this Power of Attorney was intended to give Mrs. Brady legal authority to act for George Brady, so that she would have authority to act over all the family property, regardless of whether it was in her name, his name, the estate's name, or the trust's name (T-261). Mrs. Brady testified that Respondent told her she needed George Brady's Power of Attorney because he was at that time a drug addict (by her testimony a $2,800.00 a week habit) and was not competent to handle any business matters (T55-58, 219-221).

No specific evidence was introduced as to the value of the family properties, excepting that Respondent testified that through his legal representation of Mrs. Brady, and his work involving the Estate inventory, and projected inheritance tax return, his impression was that the family properties had a value of two or three million dollars (T-396-397). Mrs. Brady's jewelry had been appraised in excess of $460,000.00 (T-49;321). There were over 760 acres of land at Brendle Corner. Also, there was direct evidence of 1,000 shares of O.G. & E. Stock and 1,200 shares of Walgreen stock.

Respondent recommended and advised Mrs. Brady to invest in the race track operation (T-364).

*Investment #1, $200,000.00 loan:* In January, 1981, Luella Brady and George Brady met with Respondent, and with officials of the First State Bank of Stroud, and borrowed $200,000.00, due in July, 1981 (later extended to January, 1982), mortgaging 320 acres of the Brady land. See Complainant's Exhibit 8 (T61–65). George Brady testified that although he remembers going to the Stroud Bank, he doesn't remember any of the details because he was on drugs at the time and was incapacitated (T-217, 218). Mrs. Brady testified that Respondent told her that the money was to be used for track improvements (T-60). The $200,000.00 loan proceeds were disbursed as follows:

(a) $75,000.00 to Luella Brady, $50,000.00 of which she thereafter immediately delivered to Respondent (T-265);

(b) $15,000.00 to Billie Cook to pay the interest on a $100,000.00 note held by her from either Midway Downs Ltd. or Coy McKenzie (T-265);

(c) $8,000.00 to Don Stover, Agent, to pay interest owed on a note by either Midway Downs Ltd. or Coy McKenzie (T-266);

(d) $3,000.00 to John Toelkes, to purchase for Coy McKenzie 1,000 shares of Midway Downs Ltd. common stock at $3.00 per share (T-267).

(e) $20,000.00 to Big Sky Race Stables (which was owned by Respondent) (T-267) to pay debts of the Stables;

(f) $20,000.00 to Big Sky Ranch (which was owned by Respondent) to pay debts of the Ranch (T-268);

(g) $5,000.00 to Willis Brown to pay an existing debt of the race track (T-268);

(h) $6,000.00 to Glen Bowles to buy for Coy McKenzie 2,000 shares of common stock in Midway Downs Ltd.

(i) $5,000.00 to Stella Sablett to pay a personal debt of Coy McKenzie (T-269).

(j) $40,000.00 directly to Coy McKenzie. He testified that he could not recall what he used this money for, but that it was probably related to the race track (T-269).

(k) $3,000.00 to Dan Lewis to purchase on behalf of Coy McKenzie 1,000 shares of common stock in Midway Downs Ltd.

In summary, of the $200,000.00 loan, $25,000.00 went to Luella Brady; $12,000.00 was used by Respondent to purchase 4,000 shares of stock in the race track (he had a

50% ownership at the time of this loan) (T–271), and the balance of $153,000.00 either went to Respondent personally, or to pay off a personal debt of his, or a debt of Midway Downs Ltd.

At Complainant's Exhibit 7 is a handwritten assignment, dated January 12, 1981, from Coy McKenzie to Luella Brady, assigning to her 5,000 shares of common stock in Midway Downs Ltd., Certificate # 93 "to protect Luella in the event of his death". It recites that it is a private contract between the two of them, not to be disclosed until the death of Respondent; and that Respondent would retain all voting rights during his lifetime and be shown as the record owner on the books of the corporation. Mrs. Brady testified that she understood that this assignment represented one-half (½) the ownership in the race track and was to protect her on the $200,-000.00 loan (T–191, 60, 202–206). Later, Mrs. Brady testified that she invested the $200,000.00 knowingly and voluntarily because she "owed him one" for helping her years before, and because she trusted him (T–132, 134). Respondent testified that this assignment was not related to the $200,000.00 loan, but rather that Mrs. Brady had loaned him $12,000.00 or $15,000.00 about four months earlier to pay interest on a debt he owed to another, and to buy some stock in the race track, and he pledged the 5,000 shares to her before the $200,000.00 loan, to afford her some protection (T–272). He gave her the stock certificate with the assignment, but at a later date she brought it back and asked him to safe-keep it.

Respondent further testified that Mrs. Brady made the $200,000.00 loan, as a friend, to help him, because his race track business was heavily in debt (T–271).

*Investment # 2: $1,000,000.00 Loan:* Respondent testified (T–369–375) that his plans were to pay the $200,000.00 note from the proceeds of a pending sale of the race track to a man called Robert Tremaine, which sale was scheduled for closing in April, 1981. However, this sale fell through. Respondent testified that he then discussed with Mary Brady the prospects

for Midway Downs in view of the increased interest in horse racing in Oklahoma, both as a parimutuel track if it was approved by the voters, or as a non-parimutuel track, and further discussed the need of a million dollar loan to consolidate the race track debts, until the track could be properly developed.

Mrs. Brady testified (T67–69) that in 1981 Respondent spent a lot of time working on the race track project and working for parimutuel betting. She took no part in the horse racing industry or in working for parimutuel betting, in that she knew nothing about it and had given the "reins" to the Respondent. She further testified that in November, 1981, Respondent discussed with her about going back to the Bank and borrowing $1,000,000 for improvements to the race track, i.e., more horse stalls, a club house and seats, and regrading the race track, as well as paying off the $200,000.00 note.

The loan was made at the First State Bank of Stroud and was structured as five (5) separate, identical loans of $200,000.00 (because of bank rules limiting the size of a loan to any one entity). The borrowers were (1) Midway Downs, Ltd.; (2) Midway Downs Training Center, Inc. (a corporation newly created by Respondent for the purpose of borrowing this money); (3) Coy McKenzie; (4) George L. Brady; and (5) George Brady, Trustee, and Luella Brady, Beneficiary, under the Trust, and Luella Brady, individually. All of the loan documents are shown at Complainant's Exhibit 10. Luella Brady, George Brady and Coy McKenzie each personally guaranteed the full million dollar loan. Each note was secured by collateral owned by each entity. The Bradys mortgaged 320 acres of land, and McKenzie mortgaged certain property owned by him.

The proceeds of the million dollar loan were then disbursed in accordance with Schedule "C" of Exhibit 10, which was almost entirely for existing debts (including substantial sums on which Respondent was personally liable); $37,000.00 of this loan was used to buy for McKenzie certain outstanding stock in the race track; and the

$200,000.00 note of January, 1981, from Luella and George Brady, was paid.

Mrs. Brady testified that she was never told that the proceeds of this loan were going to be used to pay existing debts, including notes of Respondent, and that until loan closing time, she did not know that Respondent did not already own all of the stock, nor did she know that part of the purchase price was being used to buy outstanding stock owned by others. Mrs. Brady testified that she did not read the loan documents, but relied on Respondent's assurances as her attorney that everything was all right to sign (T-111). Further, she testified that she would not have made the loan if she had known how the proceeds were going to be used. Mrs. Brady also understood that each of the signers was responsible for $200,000 only; she testified that she was not told that she was guaranteeing the entire one million dollar loan (T-76-80, 93, 113).

In consideration for Luella Brady and George Brady helping with the $1,000,000 loan, she testified that she was going to receive a one-half (½) interest in the race track (T-78), out of which she would account to George Brady for his part, when he was capable of handling it (T-194). On the other hand, the Respondent testified that his agreement with Mrs. Brady in support of the million dollar loan was that she would receive the beneficial interest of one-half (½) of what he had accumulated in the race track (T-274).

Respondent's interest in the track, which he described as "a very feasible potentially lucrative project" (T-300) had been 50%, but had increased to 60% at the time of the million dollar loan, of which she would share equally with him. The testimony of George Brady (T-221-228) as to what his mother told him she was buying tended to corroborate testimony of Respondent on this point. In any event, Respondent admitted he never put anything in writing in regard to his promise to Mrs. Brady that he would give her one-half (½) of his ownership (T-416-419); and never made any type of written assignment to her, except as assignment of the 5,000 shares in January of 1981.

Both the Respondent and Mrs. Brady were aware that because of her felony conviction, and because of her deceased father's reputation for being involved in organized crime, there was probably a legal impediment to her having an ownership interest in the race track, and that her agreement with him to have a beneficial interest in one-half (½) of his interest would have to be silent (T-285-287).

Mrs. Brady does not claim that Respondent induced her to make this investment against her will (T-135), but testified Respondent told her it looked like parimutuel would shortly be approved in Oklahoma, and that everything would work out good (T-136).

After the million dollar loan, Respondent shut down the race track and devoted his efforts to the parimutuel issue (T-384).

*Investment #3—$150,000 Loan:* In June, 1983, Respondent and Mrs. Brady went to the First National Bank and Trust Company to borrow $150,000.00, Complainant's Exhibit A. (T-84-85)

The reason for the loan, according to both the Respondent and Mrs. Brady, was that Mrs. Brady needed $50,000, for her personal use, and the Respondent needed $100,000 to help the parimutuel expense, and also help pay expenses associated with his efforts to get the Lincoln County Industrial Authority to sell bonds to pay off the million dollar loan and improve the track, and also to pay off a tax lien on the track. (T-307)

The loan was taken out jointly in the names of Luella Brady, Executrix of the Estate of Mary C. Brendle, and in the name of Coy McKenzie, mortgaging 80 acres of the Brady land, and pledging 1200 shares of Brady's Walgreen Stock. (T-309). Approval of the probate Court was not sought, or acquired (T-309). McKenzie was also attorney for the bank at the time and erroneously advised the bank the Estate held title to the land, and that the Bank would have a valid first mortgage. (In fact, the Estate did not own the 80 acres, but rather the Trust did, and there-

fore the Estate could not validly mortgage the property). (T–310–312, 407–408)

The money was disbursed $50,000 to Mrs. Brady. The remaining $100,000 was used by the Respondent for various projects related to Midway Downs, according to the Respondent (T–312).

The Respondent's plan was to pay off this loan, as well as the million dollar loan, from the sale of bonds. (T–313)

*Investment # 4—$70,000 Loan:* In May, 1984, Luella Brady borrowed $70,000 from Security National Bank and Trust Company of Norman, pledging some more of her real estate, and also pledging 1000 shares of OG & E stock, Complainant's Exhibit 12–A (T–86–87, 317). The loan proceeds were disbursed $30,000 for her own personal use, and the Respondent received $40,000 to use in matters related to the track.

*Investment # 5—$40,000 Loan:* Shortly after the Security Bank loan, Respondent arranged for a friend and client of his, Don Day, to loan $40,000 to Mrs. Brady, with Mrs. Brady's pledging $400,000 of her jewelry as collateral. The proceeds of this loan were disbursed $20,000 to Mrs. Brady and $20,000 to Coy McKenzie for matters relating to the track. (T–318–321; 89–90; 402)

*Foreclosure of Million Dollar Loan:* In 1982, a foreclosure action was filed in Lincoln County against the Respondent, Mrs. Brady, individually and as beneficiary of the Trust; and against George Brady, individually and as Trustee of the Trust, and against Midway Downs Ltd., and others to foreclose on the million dollar loan and the collateral.

According to Mrs. Brady, after she was served with summons, she took the papers to Respondent, and he told her that he would take care of it, and not to worry about it. (T–81–82, 156) She testified that McKenzie told her that the Banker had said that the Bank would hold up on the foreclosure sale until they (McKenzie and Brady) could get some money from bonds to pay it off (T–80, 143–147) Later, she understood that someone was going to protect her, by buying her land at the foreclosure sale to hold for her until the industrial bonds could be sold to pay off the debt. (T-83) Sometime later, she discovered a survey crew on "her" property platting the property for homes, and she was shocked to learn that she did not own the land anymore. (T–142). In late Spring, 1984, she realized her property was lost. (T–153)

McKenzie testified that he discussed the foreclosure suit with Mrs. Brady when she brought him the summons, and told her that they had no valid defense, and that he had talked to the Banker who had promised not to pursue the foreclosure aggressively to give them time to pay off the debt. (T–381). When time ran out and they weren't able to cover the loans with other methods of financing, he was shocked to learn that she did not have the personal economic capability to cover the loans (T–302).

McKenzie represented multiple parties in this foreclosure suit including himself, Mrs. Brady, George Brady, Midway Downs, Ltd., and Midway Downs Training Center. He did not file any pleadings other than a general denial, and asserted no affirmative defenses because he did not know of any. (T–394). He did not seek outside counsel for himself, and he did not advise Luella Brady or George Brady to seek outside counsel (T–304–305). He did approve the Journal Entry of Judgment dated June 29, 1983, Complainants's Exhibit 10G. He did not recall sending Mrs. Brady a copy of the Journal Entry (T–303), or any other pleadings in the case (T–404), but he did testify that he did keep Mrs. Brady advised periodically, when she came by his office, and had discussed with her the sheriff's sale. The Bank ultimately entered a large deficiency judgment against all of the defendants (T–306), including the Bradys, as well as McKenzie.

Both he and Mrs. Brady attempted to obtain alternate financing. He tried to get a Billion dollar loan (T–313–317). She tried unsuccessfully to find an investor, from

her contacts in Reno, Nevada, for the industrial bonds. (T–148–150).

\*     \*     \*

Respondent's defense was, (T–364–366) that Mrs. Brady exercised her own independent decision as to whether or not to enter into the race track venture, after discussing with Respondent the possible benefits and potential downside. Respondent acknowledged, however, that he was her attorney throughout all of the above transactions; that he counseled with her as to the investment, and that he knew she viewed him as her personal attorney; and that she had faith and trust in him and his advice. He did advise her as to the "investments" and deemed them to be prudent at the time. It was his belief that Mrs. Brady based her decision to invest, not upon his representations as her attorney, but more as a friend in a joint venture. He cited the fact that he had pledged everything he owned in the race track, too, and that this fact probably had a great deal to do with Mrs. Brady's deciding to invest.

He had never advised Mrs. Brady or George Brady that they needed to seek private counsel (T–323).

\*     \*     \*

Mrs. Brady's cousins, Eddie Lee Brendle and Earnie Brendle, learned of Mrs. Brady's financial losses, when they found her unkempt and without any food in the house, saying she was broke (T–346). The Brendle brothers felt that the Respondent had taken advantage of her. Attorneys were retained to try to regain her property (T–342–344), with some limited success. Ultimately, Luella Brady and George Brady lost 320 acres of land and the Walgreen and OG & E Stock, (T–411), in addition to substantial attorney fees of $70–80,000 (T–344). The deficiency judgment was released (T–410). Her jewelry was recovered. At the time of the hearing before this trial panel, by her testimony, Mrs. Brady was receiving food stamps, and living in low income housing (T–41, 198). Eddie Lee Brendle testified that he was holding property belonging to Mrs. Brady, including 140 acres at Brendle corner, and some of her jewelry (T–347). Respondent's Exhibit 2, is an Agreement dated November, 1984, whereby Luella Brady and George Brady turned over most of their assets to the Brendle brothers to manage.

The Respondent testified that he lost all of his assets, his home, his ranch and horses, his law office, everything (T–389), and has a $100,000 unsatisfied judgment against him. He has not taken bankruptcy (T–419).

Respondent presented testimony of four practicing lawyers from the Cleveland County Bar Association, Respondent, whose testimony was impressive. They were Catherine Petersen (T–324), Bill English (T–327), Bill Boswell (T–331), and Jim Moseley (T–334), who testified that the Respondent was an excellent attorney, highly trustworthy, reliable, and of high character.

## FINDINGS AND CONCLUSIONS OF LAW

By his own admission, Respondent was aware that Mrs. Brady had great personal trust in him, both as a friend and as her attorney. He used his considerable personal and professional influence over her to induce her to invest substantial sums in a risky race track venture in which he had a substantial personal business interest, and in which he was heavily indebted, and on the edge of financial collapse. The Respondent improperly served as attorney for Mrs. Brady, both in regard to her "investments", as well as her attorney in the foreclosure action, where the exercise of his professional judgment was clouded by his own financial, business, property and personal interests.

A fiduciary relationship was clearly established between the Respondent and Mrs. Brady, springing from an attitude of trust, confidence, and superior knowledge arising from the attorney-client relationship. Constructive fraud arises where there is a confidential relationship with another, and through that relationship one secures an undue advantage over the other. *Lowrance v. Patton*, 710 P.2d 108 (Okla.1985); *Looney v. Chastain*, 395 P.2d 571 (Okla.

1964); *Hamburg v. Doak*, 207 Okl. 517, 251 P.2d 510 (1953). The relationship of attorney and client is one of special trust and confidence. It requires that an attorney act toward his client with utmost good faith and fidelity and that all dealings with his client, must be fair, just and equitable, which is not the case here.

There is a maze of substantial conflicts of interest in this case. We are cognizant that under several of the Disciplinary Rules, an exception to some of the "conflicts" rules, is where the "client has consented with full disclosure". We're not satisfied that the Respondent fully disclosed. Further, Mrs. Brady was emotionally a very dependent and naive person, and was not sophisticated in business or in investments, and had absolutely no knowledge of the horse racing industry. Her consent was not knowledgeable in these circumstances, because she was under the undue influence of the Respondent, which we so find.

Accordingly, we find and conclude as a matter of law, that the Respondent has violated Rule 1.3 of the Rules Governing Disciplinary Proceedings, through the commission of acts contrary to prescribed standards of conduct, specifically that the Respondent violated:

DR 1–102 (A) . . . . . . . . . . . . . "a lawyer shall not . . .
(A)(4) . . . . . . . . . . engage in conduct involving dishonesty, fraud, or deceit;
DR 5–101 (A) . . . . . . . . . . . . . "a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."
(B) . . . . . . . . . . . . . "a lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness."
DR 5–104 (A) . . . . . . . . . . . . . "a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client."
DR 5–105 (A) . . . . . . . . . . . . . "a lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment."
(B) . . . . . . . . . . . . . "a lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client."
DR 7–101 . . . . . . . . . . . . . . . "a lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship."

It is the lawyer's duty to see that his client's rights are protected as fully as possible under the prevailing circumstances within bounds of common sense and proper professional practices. We find that the Respondent did not act in good faith or in an honest belief that his advice and acts were well founded, or in the best interest of his client, and further find that the acts of the Respondent constitute a serious ethical breach of his duty to Mrs. Brady.

As a factor for potential enhancement of discipline, although not considered by the Trial Panel in this instance, we further find that the Respondent received a public censure from the Supreme Court of the State of Oklahoma in OBAD No. 762, SCBD No. 3398, for his conviction in cause number 85–616–L in the United States District Court for the Western District of Oklahoma for willful failure to file tax returns for 1980, 1981, 1982, and 1983, in violation of 26 U.S.C. Section 7203, a misdemeanor. There was however, no tax liability due in these returns (T–358).

The Trial Panel recommends that the Respondent be disbarred.

Respectfully submitted,

Duane A. Woodliff
Duane A. Woodliff, Presiding
Master, and Panel Member

Darven L. Brown
Darven L. Brown, Panel Member

Elizabeth J. Dudash
Elizabeth J. Dudash,
Panel Member